COBB, Presiding Justice,
Specially Concurring:
¶ 64. Although I agree that Tom Morgan is entitled to custody of Catherine, I would affirm the chancellor in toto, with moderate clarifications, and therefore I write separately. In my view, this Court has inadvertently “scrambled” our child custody jurisprudence, in our attempt to address this rapidly evolving facet of Mississippi’s family law. As a result, some of the basic tenets of this jurisprudence have been overlooked, forgotten or misapplied.
¶ 65. The majority finds this Court’s opinion in Griffith v. Pell, 881 So.2d 184 (Miss.2004), controlling. Although I concurred with the opinion in Pell, I now believe we need to step back and take a more comprehensive view of the problem, and perhaps either revisit Pell (which is quickly becoming a seminal case) or distinguish it more carefully. In Pell this Court appears, to some degree, to force a square peg through a round hole in applying this Court’s in loco parentis analysis. Further, I am concerned that the majority in the present case bases its holding on Pell while specifically rejecting cases like Sellers v. Sellers, 638 So.2d 481 (Miss.1994) and Keely v. Keely, 495 So.2d 452 (Miss.1986) upon which Pell was founded. A-though Pell does not cite either of these cases, it cites Logan v. Logan, 730 So.2d 1124 (Miss.1998) extensively, and Logan was based, in part, on Sellers which itself was based on Keely.
¶ 66. Clearly, the factual basis of the present case and Pell are similar to each other and unique to this Court’s jurisprudence, and it might be easier to simply cite it and press on. However, in my view, while I wish we had addressed this more thoroughly in Pell, it is not too late to make some “corrections in our course” to prevent possible serious unforeseen consequences/difficulties in the future.
*780 In Loco Parentis — Parent versus Third Party
¶ 67. Our decision in Pell was based on an earlier, although factually and legally distinguishable, decision in Logan. In Logan the stepfather sought custody of his stepson following a divorce with the child’s mother. The Logan Court recognized a strong policy in the “law of this State that a child shall remain in the custody of one of the [natural] parents unless there has been a clear showing that both are unfit.” Id. at 1125 (quoting Sellers, 638 So.2d at 485). The basis for that statement was that “human experience has demonstrated that as a general rule parental love and solicitude for the child’s welfare are the best guarantees that it will be properly cared for and trained for the station in life for which it will likely be best fitted.” Logan, 730 So.2d at 1126.
¶ 68. Logan was a dispute between the natural parent, the mother, and a third party, the stepfather. It is well-settled law in Mississippi that a natural parent is entitled to custody, as against a third party, unless one of the following conditions is clearly proven: (1) the parent abandoned the child; (2) the parent’s immoral conduct adversely affects the child’s interests or (3) the parent is unfit to have custody. Carter v. Taylor, 611 So.2d 874, 876 (Miss.1992); Bubac v. Boston, 600 So.2d 951, 956 (Miss.1992). In Logan the chancellor specifically found the mother unfit, but refused to grant custody to the stepfather because the natural father could not be found and given notice of the hearing. Logan, 730 So.2d at 1127.
¶ 69. This Court found the chancellor’s approach troubling because the child was returned to an unfit mother while a fit and suitable third party sat waiting in the wings. Therefore, we looked to a temporary solution in the in loco parentis doctrine. The holding of Logan is markedly different from Pell because in Logan this Court found “where it is in the best interests of the child, temporary custody/guardianship should have been given to the stepfather, until such time as the biological father could be located and given proper notice.” Id. at 1124-25 (emphasis added). However, in Pell we went beyond that limited holding to find that, as between a natural parent and a “deceived” party, the chancellor erred in terminating the latter’s parental rights. Pell, 881 So.2d at 186-87.
¶ 70. In both cases this Court used the term in loco parentis; however, no clear definition was given. According to Black’s Law Dictionary in loco parentis “exists when [one] person undertakes care and control of another in absence of such supervision by [the] latter’s natural parents and in absence of formal legal approval, and is temporary in character and is not to be likened to an adoption which is permanent.” Black’s Law Dictionary, 787 (6th Ed.1990). This definition is inapposite of our holding in Pell but consistent with our holdings in Logan and those cases upon which Logan relies.
¶ 71. For support, Logan relies on Worley v. Jackson, 595 So.2d 853, 855 (Miss.1992) and Fairchild Constr. Co. v. Owens, 224 So.2d 571, 575 (Miss.1969). In Owens a claim was filed seeking worker’s compensation death benefits for a dependent child of Owens, the deceased natural father. The mother and Owens had divorced subsequent to the child’s birth, and the child had been adopted by the mother’s new husband prior to the Owens’ death. The Court held that because the child had been adopted by another man, the child was not entitled to receive death benefits from the natural father under the worker’s compensation statute. Owens, 224 So.2d at 575. The Court reasoned that one who cares for a child like his own *781 stands in the place of the natural parent or in loco parentis. Id. In Worley the paternal grandparents sought custody of their grandchild following the incarceration of the mother for murdering the child’s father. There the Court denied in loco par-entis status to the grandparents because they never intended to take the incarcerated mother’s place and because the children never regarded them as parents. Worley, 595 So.2d at 855. In neither case was a comprehensive definition given, but it is clear that both cases are factually distinguishable from Pell and the present case.
¶ 72. To better understand the substance of in loco parentis, we need only look to Farve v. Medders, 241 Miss. 75, 128 So.2d 877 (1961), cited in both Worley and Owens. In Faroe this Court held that a person acting in loco parentis is one who assumes the status of a parent, including those obligations incident to that position without a formal adoption. Farve, 128 So.2d at 879. The Court found that “[t]he rights, duties and liabilities of one standing in loco parentis are the same as those of a natural parent.” Id. Whether the relationship exists is a matter of intention and fact to be deduced from the circumstances of the particular case. Id. However, the Court added one final note, that the person standing in loco parentis is entitled to custody, “as against third parties.” Id. (emphasis added).
¶ 73. Faroe does not mention rights against natural parents, neither does Wor-ley, Oiuens or Logan. Those cases are consistent with the tenet that a person standing in loco parentis has the rights of a parent as against the entire world, except the natural parents. In Pell that standard was changed, without analysis, to apply against the child’s natural mother and in favor of what is in reality a third party. The change in Pell tore in loco parentis from its original moorings. In loco paren-tis was never meant to be used against the natural parent as it is in this case and in Pell. Rather, the doctrine was intended to protect third parties, who assume custody and care of a child whose natural parents are absent or unable to care for it, from losing the child to other third parties including the State.
¶ 74. Therefore, in my view, we should not use in loco parentis to strip custody from Jane. In custody disputes between natural parents and third parties, it is presumed that the child’s best interest is served by remaining with the natural parent. Mabus v. Mabus, 847 So.2d 815, 819 (Miss.2003). Under the traditional in loco parentis analysis Tom is a third party, and, absent a showing that Jane was unfit, immoral or had abandoned Catherine, application of in loco parentis is inappropriate to grant Tom custody. A finding of unfitness requires a higher burden than is met by a best interest analysis under Al-bright. See In re Custody of M.A.G., 859 So.2d 1001, 1004 (Miss.2003) (a finding of unfitness is necessary to award custody to a third party against a natural parent and must be done before a best interest analysis).
¶ 75. There was no showing before the chancellor, that Jane was an unfit parent, had abandoned Catherine or engaged in immoral conduct. It is true that Jane has had her share of problems, however she appears to be back on her feet, and even the chancellor commented as to the marked improvement in her life. Applying the traditional third party versus natural parent analysis, Tom could simply not be afforded custody of Catherine. This Court has twisted the meaning of in loco paren-tis and is now using it in a way that is clearly unwarranted by our precedent. However, Tom should be given custody of Catherine, so another approach must be utilized.
*782 ¶ 76. There are at least two possibilities, both of which have been addressed in other jurisdictions: namely, equitable es-toppel and equitable parenthood. The first is not plausible under the timing and facts of the present case, but a brief description is instructive.

1. Equitable Estoppel

¶ 77. A party asserting equitable estop-pel- must prove that he- changed position in reliance upon a promise or conduct of another and that the change in position was to his detriment. PMZ Oil Co. v. Lucroy, 449 So.2d 201 (Miss.1984) (citing Ivy v. Grenada Bank, 401 So.2d 1302, 1303 (Miss.1981); Thomas v. Bailey, 375 So.2d 1049, 1052 (Miss.1979); Birmingham v. Conger, 222 So.2d 388, 392-93 (Miss.1969)). A number of sister jurisdictions have applied equitable estoppel to child- custody cases like the present one to prevent the mother from attacking the husband’s paternity. Randy A.J. v. Norma I.J., 270 Wis.2d 384, 402, 677 N.W.2d 630, 639 (2004); Ohning v. Driskill, 739 N.E.2d 161, 163 (Ind.App.2000); Van v. Zahorik, 460 Mich. 320, 335, 597 N.W.2d 15, 22 (1999); In re Marriage of Gallagher, 539 N.W.2d 479, 482 (Iowa 1995); Matter of Marriage of Hodge, 84 Or.App. 62, 65, 733 P.2d 458, 459 (1987).
¶ 78. Several other jurisdictions have followed this rationale and estopped a wife from challenging paternity in dissolution-related proceedings, subsequent to dissolution. Ex parte Presse, 554 So.2d 406, 411 (Ala.1989) (applying doctrine of collateral estoppel); In re Marriage of Ross, 13 Kan.App.2d 402, 772 P.2d 278, 283, aff'd in part and rev’d in part on other grounds, 245 Kan. 591, 783 P.2d 331 (1989) (wife es-topped from denying paternity); Boyles v. Boyles, 95 A.D.2d 95, 466 N.Y.S.2d 762, 765 (1983) (applying traditional theory of estoppel); Nelson v. Nelson, 10 Ohio App.3d 36, 460 N.E.2d 653, 654-55 (1983) (estopping wife from denying parentage to avoid “fathershopping” and the problem of staleness of evidence); Adoption of Young, 469 Pa. 141, 364 A.2d 1307, 1313 (1976) (invoking collateral estoppel); In re Paternity of D.L.H., 142 Wis.2d 606, 419 N.W.2d 283, 286-87 (1987) (invoking equitable es-toppel).
¶79. In my view, the case before us today has a classic factual setting for the application of equitable estoppel. However, the case comes to us iñ a posture which prevents our doing so. Catherine was conceived outside of wedlock but born into the marriage. Jane held out Catherine as a child of the marriage for the first seven years of her life, including placing Tom’s name on her birth certificate as the child’s father. See Hodge, 733 P.2d at 459 (placing husband’s name on birth certificate is a representation of the fact that he is the biological father). Jane even held Catherine out as a child of the marriage to the chancellor for the first year of the divorce proceedings. See Ohning, 739 N.E.2d at 163 (equitable estoppel is appropriate when the mother assumes a legal position contrary to the one she previously asserted to the court). Jane has at all times prior to admitting that Tom was not the biological father, encouraged a father-daughter relationship between Tom and Catherine, to the point that she recommended to the chancellor that Tom be given temporary custody of Catherine. See Hodge, 733 P.2d at 459-60.
¶ 80. In my view, it would be a miscarriage of justice to deny Tom the relationship he has built with Catherine. Tom is the only father Catherine has known, and Tom has spent the last eight years caring for Catherine as if she was his daughter. I cannot with all good conscious conclude that Jane should be allowed to keep Tom away from Catherine. The equities simply weigh too strongly against it. Had- this *783 case come to us absent the proof that Tom was not the biological father, Jane would be estopped from severing the relationship with Tom. As that remedy is not available, we must consider the second approach.
2. Equitable Parenthood — Parent versus Parent
¶ 81. Even though judicial economy would have been better served had Jane been estopped from challenging Tom’s paternity of Catherine at an earlier point in the proceedings, obviously we must deal with the fact that it has now been proven that Tom is not her biological father. Were we able to un-ring the bell, there would be no doubt that Tom was the child’s presumed father, and no further analysis would be required. It is well-settled law in Mississippi that a man is presumed the natural father of a child when he was married to the mother at the time of birth. Baker by Williams v. Williams, 503 So.2d 249, 253 (Miss.1987). This presumption applies even though the child was conceived prior to the marriage. Id.
¶ 82. However, the bell cannot be un-rung. Further, equitable estoppel could only be used by Tom against Jane, whereas the rest of the world still could challenge Tom’s parental rights. The chancellor confronted this issue by using equitable parenthood to vest Tom with parental rights as against the rest of the world, basing his decision on the holding of the Iowa Supreme Court in In re Marriage of Gallagher, 539 N.W.2d 479 (Iowa 1995). The majority dismissed this approach, opting to apply in loco parentis, which is problematic because application of in loco parentis has no clear limit. The doctrine of equitable parenthood, as it was applied by the chancellor, is more in line with United States Supreme Court precedent and our traditions.
¶ 83. The United States Supreme Court has emphasized the importance of the family unit and granted individuals due process rights in preserving the continuation thereof. Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). The touchstone of all child custody disputes is the best interest of the child. Lehr. v. Robertson, 463 U.S. 248, 257, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983); Williams, 503 So.2d at 252. Looking through that lens, the right to custody of the child requires more than a biological connection. As Justice Stewart said in his oft-quoted concurrence, “[pjarental rights do not spring full-blown from the biological connection between parent and child. They require relationships more enduring.” Caban v. Mohammed, 441 U.S. 380, 397, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979) (Stewart, J., concurring). “The emotional attachments that derive from the intimacy of daily association, and from the role it plays in ‘promot[ing] a way of life’ through the instruction of children as well as from the fact of blood relationship” also shows the importance of the familial relationship. Lehr, 463 U.S. at 261, 103 S.Ct. 2985 (quoting Smith v. Organization of Foster Families for Equality and Reform, 431 U.S. 816, 844, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977)) (emphasis added). This is a clear revelation from the United States Supreme Court that the family unit is more than biology, rather it is a sum of its parts including the bond which forms between an “equitable father” and child. In my view, there is room in United States Supreme Court jurisprudence for the doctrine of equitable parenthood.
¶ 84. There are two distinct approaches to equitable parenthood. It is accepted that the doctrine of equitable parenthood was born in the Michigan decision of Atkinson v. Atkinson, 160 Mich.App. 601, 408 N.W.2d 516 (1987). See Randy A.J., 677 *784 N.W.2d at 642. In Atkinson, the Michigan Court of Appeals crafted the following three-part test:
Therefore, we adopt the doctrine of “equitable parent” and find that a husband who is not the biological father of a child born or conceived during the marriage may be considered the natural father of that child where (1) the husband and the child mutually acknowledge a relationship as father and child, or the mother of the child has cooperated in the development of such a relationship over a period of time prior to the filing of the complaint for divorce, (2) the husband desires to have the rights afforded to a parent, and (3) the husband is willing to take on the responsibility of paying child support.
Atkinson, 408 N.W.2d at 519. This was modified by the Iowa Supreme Court in In re Marriage of Gallagher where the Court held:
Applying general equitable principles, however, we believe equitable parenthood may be established in a proper case by a father who establishes all the following: (1) he was married to the mother when the child is conceived and born; (2) he reasonably believes he is the child’s father; (3) he establishes a parental relationship with the child; and (4) shows that judicial recognition of the relationship is in the child’s best interest.
In re Marriage of Gallagher, 539 N.W.2d at 481. The two tests are similar but have markedly different permutations. The parameters of the Atkinson test are “too indistinct, permitting its use to create uncertainties in the law.” Randy A.J., 677 N.W.2d at 642. For that reason I would agree with several of our sister states who have been unwilling to adopt this approach. See Dept. of Human Services v. Chisum, 85 P.3d 860, 863 (Okla.Ct.App.2004); Randy A.J., 677 N.W.2d at 642.
¶ 85. In my view, In re Marriage of Gallagher is more in step with Supreme Court precedent and our traditions, and therefore we should adopt it in the present case. With the progress of science and the movement of contemporary moral values, the basic structure of the family has shifted. We should not apply laws that force a square peg through a round hole, but rather we should adopt an approach that allows us to deal with changes while remaining resolute in our protection of the most basic tenets of the family.
¶ 86. Upon close scrutiny, in loco parentis does not even require a stable family. All that is required is a willingness by the non-biologically related party to accept the child into the household and care for it under a minimum yet undefined standard. That fails to preserve our traditions and refutes the Supreme Court’s desire to ensure the protection of the family unit. The approach taken in In re Marriage of Gallagher protects the family unit. The first factor preserves this State’s presumption that it is a child of the marriage by ensuring that it was born during the marriage.[8] Thus the chancellor must determine, based on an objective standard, that the husband reasonably could have believed that it was his child, and based on that reasonable belief, the husband established a father-child relationship. Lastly, by allowing a best-interest analysis, the chancellor is put in the familiar role of weighing competing factors to determine as a matter of fact that the *785 child would benefit from the continuing relationship.
¶ 87. In my view, we should not apply in loco parentis to the present facts. Although it is too late for this Court to prevent Jane from asserting Tom’s lack of paternity, we nevertheless should adopt the equitable parenthood doctrine and thereby turn this dispute into one between two parents as opposed to one between a parent and a third party. From the chancellor’s Albright analysis it is clear that the chancellor did not abuse his discretion in awarding custody to Tom. In that case, applying the reasoning discussed above, this Court would merely affirm the chancellor’s judgment and not further distort in loco parentis analysis as was done in Pell.
DICKINSON, J. JOINS THIS OPINION. RANDOLPH, J„ JOINS THIS OPINION IN PART.

. Although the first factor under the Gallagher standard requires both conception and birth to occur during marriage, we could slightly alter it to be consistent with this State's presumption that a husband is the natural father if the child is born during the marriage and that the time of conception is irrelevant.